UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

S.B.,

       Plaintiff,

   v.

Minnesota State High School League,

       Defendant.

Case No. 0:21-cv-02553 (ADM-JFD)

**DEFENDANTS' MEMORANDUM OF LAW OPPOSING PLAINTIFF'S MOTION FOR TRO**

---

## INTRODUCTION

Plaintiff seeks a Temporary Restraining Order (hereafter "TRO") forcing Defendant Minnesota State High School League (the "MSHSL" or "League") to allow Plaintiff to participate in varsity athletic competition at Chatfield High School ("Chatfield") on November 26, 2021. Plaintiff is not eligible to participate in the game on November 26 because he is subject to a one-game suspension after he was ejected from the previous game after receiving two separate unsportsmanlike conduct penalties.

Plaintiff asks this Court to change the status quo pending trial, and in essence, seeks the relief ultimately requested by bypassing a trial on the merits of the case. Because the right to a public education under Minnesota law does not include eligibility for interscholastic varsity athletic competition, Plaintiff cannot establish a likelihood of success at trial on his due process claims and his motion for a TRO should be denied.

1

**BACKGROUND**

In addition to the documents already submitted by Plaintiff, Defendant submits the Declaration of Erich Martens in support of its opposition to Plaintiff's motion for a temporary restraining order. The declaration and its exhibits are attached and incorporated herein by reference.

The MSHSL is a non-profit, voluntary association of high schools which sponsors one of the most comprehensive programs of interscholastic activities in the United States— activities that involve approximately 500 member schools, 200,000 students, 20,000 coaches, and 10,000 contest officials and judges. Declaration of Erich Martens, ¶ 2; *see also* Minn. Stat. § 128C.01. Minnesota ranks 10th in the nation in the total number of student athletes. *Id.* The MSHSL regulates and supervises the interscholastic extracurricular activities of member schools. Martens Decl. ¶ 4. One of the principal functions of the League is to adopt standards and regulations for its member schools that will promote fair and safe athletic competition and to elevate standards of sportsmanship. *Id.* The MSHSL has prioritized sportsmanlike conduct in all sports and activities. Martens Decl. ¶ 6.

Student Eligibility requirements of the League are contained in Bylaws 201 through 209. Martens Decl. ¶ 11. Bylaw 206.4 provides unambiguous direction when a student or coach is ejected from a contest. *Id.* Specifically, Bylaw 206.4.B(1)(c) governs ejections during post-season play and explicitly states that a "student-athlete who is ejected from a game, meet, or individual competition shall not participate in a game, meet, or individual competition for the remainder of that day . . . [and] is also suspended from the next

2

scheduled round of team or individual competition within that tournament series." *Id.*

Bylaw 206.4.C allows for one narrow appeal of application of its penalties: "A basketball coach may appeal the penalty only when he/she is disqualified for technical fouls and his/her actions did not contribute to the disqualification." Martens Decl. ¶ 12. This very narrow exception applies to basketball coaches because they are held responsible for the conduct of their bench irrespective of their personal behavior. *Id.* For instance, if a player leaves the bench or engages in unsportsmanlike conduct while on the bench that results in a technical foul, it is attributed to the coach. *Id.* In that situation, the appeal is "heard by the local school administration." *Id.* There is no appeal when a basketball coach is ejected for their own unsportsmanlike conduct. *Id.*

When an official ejects a coach or student from a contest, they review the decision with the entire officiating team both at the time that the penalty is called and informally following the game to ensure it has been appropriately identified. Martens Decl. ¶ 13. Protests Against Decisions of Contest Officials are governed by Bylaw 407. Martens Decl. ¶ 14. Bylaw 407.1 unambiguously states that "Protests against decisions of contest officials ***will not be honored***." Martens Decl. ¶ 14 (emphasis added). Bylaw 407.1.A unambiguously states that "decisions of contest officials are final." Martens Decl. ¶ 15. Bylaw 407.1.B states: "It is recognized that errors in interpretations and application of bylaws and in judgment situations are inevitable. However, **the orderly and sportsmanlike conduct of high school activities requires that officials' decisions must be honored and be final**." Martens Decl. ¶ 16 (emphasis added). Bylaw 407.1.C provides that "**Video recordings will not be used to overrule an official's decision**." Martens

Decl. ¶ 17 (emphasis added).

During the state championship semifinal football game held on November 18, 2021, Plaintiff received two separate unsportsmanlike conduct penalties. Verified Compl. ¶¶ 10-12. When a football player receives two unsportsmanlike conduct penalties in the same game, he/she is automatically ejected from the contest. Martens Decl. ¶ 23. Per MSHSL Bylaw 206.4.B(1)(c), when a student is ejected from a contest during the League Tournament Series, which includes the semifinal game, they are prohibited from participating in any contest for the remainder of that day and are "also suspended from the next scheduled round of team or individual competition in that tournament series." Because Chatfield won the semifinal game, the next scheduled round of team competition in that tournament series is the Prep Bowl Finals scheduled to be played on November 26, 2021. Verified Compl. ¶ 16.

Because Plaintiff disagrees with the penalties that were called against him during the contest, he seeks judicial intervention to immediately enjoin the MSHSL from applying the one-game suspension and allow Plaintiff to participate in the championship game on November 26.

## ARGUMENT

I.    **APPLICATION OF THE *DATAPHASE* FACTORS DOES NOT SUPPORT THE ISSUANCE OF A TEMPORARY INJUNCTION**.

"Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability

that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C.L. Sys., Inc.* 640 F.2d 109, 114 (8th Cir. 1981).

A preliminary injunction is an extraordinary remedy, *see Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir.1987), and the burden of establishing the propriety of an injunction is on the movant, *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir.1995). "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113.

Plaintiff requests this Court to enjoin the MSHSL from applying the mandatory, automatic one-game suspension following a student-athlete's ejection from a contest. In effect, Plaintiff seeks to change the status quo and bypass a trial on the merits to allow Plaintiff to participate in the championship game on November 26. Plaintiff's request to change the status quo prior to a trial on the merits contravenes a TRO's purpose to preserve the status quo until adjudication of the case. To obtain the extraordinary remedy of a TRO, Plaintiff must show a likelihood of succeeding on the merits that is so high to necessitate a review of the other factors. *See CDI Energy Servs., Inc. v. W. River Pumps, Inc.,* 567 F.3d 398 (8th Cir. 2009); *S & M Constructors, Inc. v. Foley Co., 959 F.2d 97* (8th Cir. 1992).

In this case, a weighing of the *Dataphase* factors, in particular Plaintiff's likelihood of success at trial, demonstrates that Plaintiff's request for a temporary restraining order should be denied.

### A.   PLAINTIFF'S LIKELIHOOD OF SUCCESS IS MINIMAL.

Plaintiff has plead one count—(1) substantive and procedural due process under the

Fourteenth Amendment of the United States Constitution. In light of the considerable deference that must be given to a state actor's construction of its own regulations and the United States District Court's decision in *DeLaTorre v. MSHSL*, 202 F.Supp.3d 1046, 1058 (D. Minn. 2016), Plaintiff has no likelihood of success on the merits of his claims and a TRO should not be granted.

### 1.    There is no constitutionally protected property or liberty interest in participating in extracurricular varsity competition.

Plaintiff is unable to meet the threshold requirement of showing that a protected property or liberty interest has been implicated by the defendants. *Bishop v. Tice*, 622 F.2d 349, 353 (8th Cir. 1980). Moreover, Plaintiffs cannot "prove that the defendant deprived him of such an interest without due process of law." *Gordon v. Hansen et al.*, 168 F.3d 1109, 1114 (8th Cir. 1999) (internal citation omitted).

Contrary to Plaintiff's assertions, Minnesota has not recognized a protected property right or fundamental liberty interest in interscholastic varsity athletics. Plaintiff cobbles together an argument based primarily upon outdated *dicta*, a footnote, and a non-precedential Minnesota Attorney General opinion. *See J.K. ex rel. Kaplan v. Minneapolis Public Schools*, 849 F.Supp.2d 865, 875 (D. Minn. 2011); *Giblin v. Minnesota State High School League*, 1982 WL 963044 (D. Minn. Jan. 15, 1982); *Thompson v. Barnes*, 200 N.W.2d 921, n.11 (Minn. 1972); Minn. Op. Att'y Gen. 169-F, 1989 WL 505812 (Mar. 28, 1989). The same arguments advanced by Plaintiff here were considered and explicitly rejected by this Court in *DeLaTorre v. Minnesota State High School League*, 202 F.Supp. 3d 1046, 1055-58 (D. Minn. 2016). Curiously, Plaintiff did not cite *DeLaTorre* in his

memorandum in support of a temporary injunction.

Plaintiff's reliance on the federal court's decision in *J.K. v. Minneapolis Pub. Schools* is misplaced, as *J.K.* merely *speculated*, in non-precedential *dicta*, that if presented with the issue, the Minnesota Supreme Court *may* find a property right in extracurricular activities.[1] *See* 849 F.Supp.2d 865, 877 (D. Minn. 2011). A careful review of *J.K.'s* analysis further highlights its shortcomings. For example, *J.K.* cited favorably to a footnote in *Thompson v. Barnes*, which did not hold or even suggest a constitutionally-protected property right to participation in extracurricular activities. To the contrary, the footnote merely states that that particular issue had been rendered moot. *See* 200 N.W.2d 921, 926 n.11 (Minn. 1972). Any suggestion by *Thompson* that there exists a property right in extracurricular activities was quashed by *Eason v. Indep. Sch. Dist. No. 11*, 598 N.W.2d 414, 419 (Minn. App. 1999) (citing *Peterson*, 999 F.Supp. at 674 for the holding that there is "no property or liberty interest in a student's participation in extracurricular activities").

*J.K.* also emphasized that the *Thompson* footnote cited to *Kelley v. Metro. Cnty. Bd. of Educ. Of Nashville*, 293 F.Supp. 485 (M.D. Tennessee 1968), to suggest a property right in extracurricular activities. *See J.K.*, F.Supp.2d at 876-77. *J.K.'s* citation to *Kelley* to suggest a property right in extracurricular activities is curious because just before favorably citing to *Kelley*—a federal case from a different circuit which found a property right under Tennessee law—*J.K.* expressly acknowledged and then disregarded the overwhelming

---

[1] It is worth noting that the MSHSL was not a party to the proceedings in *J.K.* and that the parties in that action did not raise or address the issue of a property right in extracurricular activities but rather the court did so *sua sponte*. Accordingly, what little relevance *J.K.* may have had was extinguished by the *DeLaTorre* decision on the merits of this issue.

majority of State and Federal courts that have found no constitutionally protected property interest in participating in extracurricular activities because "they rel[ied] on other states' law" or were determined "only under federal constitutional law." *See J.K.*, 849 F.Supp.2d at 875. Yet, *J.K.* then cited with favor four cases which found a property right in extracurricular activities based upon *other states' laws*. *Id.* at fn.8. This inconsistent reasoning underscores *J.K.'s* lack of persuasive authority.

Regardless of the reasoning, this court has expressly rejected the argument and caselaw Plaintiff relies upon to support his claim. *See DeLaTorre*, 202 F.Supp. 3d at 1058 ("the right to a public education *under Minnesota law* does not include eligibility for interscholastic varsity athletic competition.") (emphasis added); *see also Peterson v. Independent School Dist. No. 811*, 999 F.Supp. 665, 674 (D. Minn. 1998) ("no property or liberty interest exists in a student's participation in extracurricular activities."). Notably, *DeLaTorre* is a more recent decision, on the merits, and is squarely in line with other circuit courts,[2] including the Eighth Circuit, that have determined that "a student's interest in participating in . . . interscholastic athletics amounts to a *mere expectation* rather than a constitutionally protected claim of entitlement, . . . [and therefore] falls outside the protection of due process." *In Re U.S. ex rel. Missouri State High Sch., et al.*, 682 F.2d 147, 153 fn.8 (8th Cir. 1982) (emphasis added) (internal citation omitted). *DeLaTorre* is also in

---

[2] *See e.g., Cornerstone Christian Schs v. Univ. Interscholastic League*, 563 F.3d 127, 136-37 (5th Cir. 2009) (citing *Walsh v. La. High Sch. Athletic Ass'n*, 616 F.2d 152, 159 (5th Cir. 1980)); *Angstadt v. Midd-West Sch. Dist.,* 377 F.3d 338, 344 (3d Cir. 2004); *Seamons v. Snow*, 84 F.3d 1226, 1235 (10th Cir. 1996); *Davenport ex rel. Davenport v. Randolph Cnty. Bd. of Educ.*, 730 F.2d 1395, 1397 (11th Cir. 1984); *Hamilton v. Tenn. Secondary Sch. Athletic Ass'n*, 552 F.2d 681, 682 (6th Cir. 1976); *see also Ventetuolo*, 638 F.2d 5.

line with the vast majority of federal[3] and state[4] courts which have addressed this issue and

---

[3] *See Dominic J. v. Wyo. Valley W. High Sch.*, 362 F.Supp.2d 560, 572 (M.D. Penn. 2005); *Jeffrey v. Bd. of Trs. of the Bells ISD*, 261 F. Supp. 2d 719, 726 (E.D. Tex. 2003); *Smith v. Chippewa Falls Area Unified Sch. Dist.,* 302 F. Supp. 2d 953, 957 (W.D. Wis. 2002); *Wooten v. Pleasant Hope R-VI Sch. Dist.*, 139 F. Supp. 2d 835, 842 (W.D. Mo. 2000); *Farver v. Bd. of Educ. of Carroll County*, 40 F.Supp.2d 323, 334 (D. Md. 1999); *Mazevski v. Horseheads Cent. Sch. Dist.,* 950 F. Supp. 69, 72-3 (W.D.N.Y. 1997); *McFarlin*, 784 F. Supp. at 592; *Giannattasio v. Stamford Youth Hockey Ass'n, Inc.*, 621 F. Supp. 825, 829 (D. Conn. 1985); *Justice v. NCAA*, 577 F. Supp. 356, 366 (D. Ariz. 1983); *Park Hills Music Club, Inc. v. Board of Education*, 512 F. Supp. 1040, 1043 (S.D. Ohio 1981); *Williams v. Hamilton*, 497 F. Supp. 641, 645 (D.N.H. 1980); *Pegram v. Nelson*, 469 F. Supp. 1134, 1140 (M.D.N.C. 1979); *Ward v. Robinson*, 496 F. Supp. 1, 1-2 (E.D. Tenn. 1978); *Fluitt v. University of Nebraska*, 489 F. Supp. 1194, 1202-03 (D. Neb. 1980); *Kulovitz v. Illinois High School Association*, 462 F. Supp. 875, 877-78 (N.D. Ill. 1978); *Taylor v. Alabama High School Athletic Association*, 336 F. Supp. 54, 57 (M.D. Ala. 1972); *Paschal v. Perdue*, 320 F. Supp. 1274, 1276 (S.D. Fla. 1970).

[4] *See Ventetuolo*, 638 F.2d at 6 ("under Rhode Island law, there is no property right to play interscholastic sports"); *Scott v. Kilpatrick*, 237 So. 2d 652, 656 (Ala. 1970); *Ryan v. Cal. Interscholastic Fed'n — San Diego Section*, 114 Cal. Rptr. 2d 798, 808 (Cal. Ct. App. 2001) ("Neither the California Constitution nor California statutory law contains any provision that entitles students to an absolute right to participate in extracurricular activities and, precisely, in interscholastic athletics."); *L.P.M. and J.D.T. v. Sch. Bd of Seminole County*, 753 So.2d 130 (Fla. Dist. Ct. App. 2000); *Smith v. Crim*, 240 S.E.2d 884, 886 (Ga. 1977); *Jordan*, 706 N.E.2d 137; *Chabert v. Louisiana High School Athletic Association*, 312 So.2d 343, 345 (La. App. 1975); *Mancuso v. Mass. Interscholastic Athletic Ass'n, Inc.*, 900 N.E.2d 518 (Mass. 2009) (no property or liberty interest under Massachusetts Constitution in participating in extracurricular activities); *Berschback v. Grosse Pointe Pub. Sch. Dist.*, 397 N.W.2d 234, 243 (Mich. Ct. App. 1986); *Mississippi H.S. Activities v. Coleman*, 631 So.2d 768, 774 (Miss. 1994); *State ex rel. Missouri State High School Activities Association v. Schoenlaub*, 507 S.W.2d 354, 359 (Mo. 1974); *Brooks v. Section V of New York State Public High School Athletic Ass'n., Inc.*, 752 N.Y.S.2d 468 (N.Y. App. Div. 2002); *Caso v. New York State Public High School Athletic Association*, 434 N.Y.S.2d 60 (N.Y. App. Div. 1980); *Menke v. Ohio High School Athletic Association*, 441 N.E.2d 620, 624 (Ohio 1981); *Whipple v. Oregon School Activities Association*, 629 P.2d 384, 386 (Or. 1981); *Pennsylvania Interscholastic Athletic Association, v. Greater Johnstown School District*, 463 A.2d 1198, 1201 (1983); *Bruce v. South Carolina High School League*, 189 S.E.2d 817, 819 (1972); *Tennessee Secondary School Athletic Association v. Cox*, 425 S.W.2d 597, 602 (1968); *Spring Branch I.S.D. v. Stamos*, 695 S.W.2d 556, 561 (Tex. 1985); *Starkey v. Board of Education*, 381 P.2d 718, 721 (Utah 1963); *Bailey v. Truby*, 321 S.E.2d 302, 315-16 (W. Va. 1984) ("Participation in extracurricular activities, including interscholastic athletics, does not rise to the level of

found no constitutionally-protected property interest in participating in extracurricular athletics under either the United States Constitution or the respective state Constitutions. Because Plaintiff has not demonstrated a protected property interest in interscholastic athletics, there is no likelihood of success on the merits of his due process claim and the TRO should be denied.

It is critical that *DeLaTorre* thoroughly detailed the history of cases and authorities addressing this issue in Minnesota before holding that "the right to a public education *under Minnesota law* does not include eligibility for interscholastic varsity athletic competition." *DeLaTorre*, 202 F.Supp.3d at 1058 (emphasis added). *DeLaTorre* is "a considered decision and should not be lightly disregarded by other judges." *Sears Roebuck & Co. v. Stockwell*, 143 F. Supp. 928, 932 (D. Minn. 1956) ("[prior decision] has acquired a sanctity within the doctrine of stare decisis. . . . [and i]n the absence of palpable mistake or error, it should be respected as the law until changed by an appellate court.").

The *Gibson/W.D./J.K.* cases relied upon by Plaintiff are thus inapposite in light of this Court's more recent holding, on the merits, in *DeLaTorre*. *DeLaTorre* thoughtfully analyzed and discounted those cases because they were decided in the context of motions for preliminary injunctive relief[5] and were, therefore, not adjudications on the merits. *See*

_____

a fundamental or constitutional right under . . . the West Virginia Constitution."); *see also Nieshe v. Concrete Sch. Dist.*, 127 P.3d 713 (Wash. Ct. App. 2005) (no property interest under the Washington Constitution in attending graduation ceremony).

[5] *See, e.g.*, *H.R. ex rel. S.R. v. Minnesota State High School League*, Civil No. 13–16, 2013 WL 147416 (D.Minn. Jan. 14, 2013); *W.D. ex rel. M.J.D. v. MSHSL*, 2012 WL 5985514 (D. Minn. November 29, 2012); *J.K. ex rel. Kaplan v. Minneapolis Pub. Sch.*, 849 F.Supp. 2d 865 (D. Minn. 2011), *Giblin v. MSHSL*, 1982 WL 963044 at *3 (D. Minn. January 15, 1982).

*DeLaTorre*, 202 F.Supp.3d at 1058 (noting "several cases that have addressed whether Minnesota recognizes a property interest in eligibility for interscholastic varsity athletics did so in the context of motions for preliminary injunctive relief. The cases are not adjudications on the merits") (citing *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 603 (8th Cir.1999) ("Of course, neither the District Court's denial of the motion [for a preliminary injunction] nor our affirmation of the District Court's judgment will bind the District Court or the parties in any further proceedings in this case, for adjudication of a motion for a preliminary injunction is not a decision on the merits of the underlying case."); *Thompson*, 200 N.W.2d at 927 ("Ordinarily, neither a lower court nor this court is called upon in such a proceeding to adjudicate finally the issues raised in the complaint, and denying a temporary injunction neither establishes the law of the case nor constitutes an adjudication on the merits of the issues raised in the complaint.")). In contrast, *DeLaTorre* was an adjudication on the merits dismissing such claims on a Rule 12(b)(6) motion to dismiss. Such a decision by a United States District Court Judge (and former Justice of the Minnesota Supreme Court) interpreting Minnesota law is exceedingly persuasive.

Not only were many of the cases relied upon by Plaintiff decided in the context of a temporary injunction but nearly all of the cases were unpublished decisions[6] with no

---

[6] *See, e.g.*, *H.R. ex rel. S.R. v. Minnesota State High School League*, Civil No. 13–16, 2013 WL 147416 (D. Minn. Jan. 14, 2013); *W.D. ex rel. M.J.D. v. MSHSL*, 2012 WL 5985514 (D. Minn. November 29, 2012); *J.K. ex rel. Kaplan v. Minneapolis Pub. Sch.*, 849 F.Supp. 2d 865 (D. Minn. 2011), *Giblin v. MSHSL*, 1982 WL 963044 at *3 (D. Minn. January 15, 1982)

precedential value. *Vlahos v. R&I Const. of Bloomington, Inc.*, 676 N.W.2d 672, 676 n.3 (Minn. 2004) ("Unpublished decisions should not be cited by the district courts as binding precedent."). Because Plaintiff cannot show that he has a constitutionally protected property or fundamental liberty interest to participate in interscholastic varsity athletic competition, Plaintiff is unlikely to succeed at trial and his motion for a TRO should be denied. Nevertheless, both procedural and substantive due process are addressed below.

### a.    Procedural Due Process

"To make out a claim for a violation of procedural due process, the plaintiff has the burden of showing that '(1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest.'" *Stevenson v. Blytheville Sch. Dist. # 5*, 800 F.3d 955, 965–66 (8th Cir. 2015). As discussed above, Plaintiff erroneously asserts that Minnesota recognizes a property interest in athletic "varsity eligibility" and that he has "a constitutionally protected property right" in interscholastic athletic eligibility.

Plaintiff is subject to a one-game suspension in accord with the plain, unambiguous bylaws of the MSHSL based upon his conduct. In fact, Plaintiff acknowledges that he knew "that if he were to receive two unsportsmanlike conduct calls he would be ejected and suspended for the next game." Plaintiff's Memorandum, p. 8. Yet, when that exact scenario presented itself, Plaintiff seeks judicial intervention because he "disagrees" with the contest officials' determinations. Rule 9-5-1 in NFHS Rules of Football state that two unsportsmanlike conduct fouls results in disqualification. Martens Decl. ¶ 23. In addition, 9-4-3j states that no player

shall strike an opponent with his fist, locked hands, forearm or elbow, nor kick or knee him. *Id.* The penalty for that foul is 15 yards and disqualification. *Id.*

Plaintiff seeks to use federal court resources to contest a referee's decision to issue penalties in a high school football game on November 18, 2021, that resulted in Plaintiff's ejection from the game. In accord with MSHSL Bylaw 206.4.B(1)(c), when a student athlete is ejected from a game during the League Tournament Series (subsection, section, and state tournament), they "shall not participate in a game . . . for the remainder of that day [and] is also suspended from the next scheduled round of team or individual competition in that tournament series." There is no dispute that Plaintiff was ejected after receiving two unsportsmanlike conduct penalties—one in the second quarter and another in the third quarter. Compl. ¶ 12. Instead, Plaintiff "disagrees" with those on-the-field-calls and asks this Court to intervene. The decision to issue unsportsmanlike conduct penalties is a judgment call left to the discretion of the contest official or referee. Martens Decl. ¶ 22. . By operation of the plain, unambiguous language of Bylaw 206.4.B(1)(c), an ejection results in a mandatory, automatic one-game suspension. Contest officials and referees must have the support of the participating schools to be able to administer the contest "entirely in their hands". Martens Decl. ¶ 19. To be effective, decisions of contest officials must be made with the support of the member schools and without interruption for appeal or review. *Id.*

Plaintiff's Verified Complaint and Memorandum of Law lays bare that Plaintiff seeks judicial intervention into the on-the-field calls of contest officials and referees. *See* Verified Compl. ¶ 17 ("SB disagrees with the MSHSL Officials' unsportsmanlike conduct

calls issued to him during Chatfield's semifinals football game"); *see also* Plaintiff's Memorandum of Law, p. 8 ("SB seeks a meaningful review of the two unsportsmanlike conduct calls and subsequent suspension by a neutral decisionmaker"). At a minimum, Plaintiff seeks judicial intervention to require the MSHSL to establish a due process mechanism whenever a player "disagrees" with a referee or official's call during the game-of-play.

Plaintiff seeks the type of judicial intervention in extracurricular eligibility decisions that at least one federal court feared would "result in a deluge of litigation over not only athletic participation, but also participation in activities that others may hold as dear as some do sports, such as band, theatre, or choir." *See McFarlin ex rel. Hardaway v. Newport Special Sch. Dist.*, 784 F. Supp. 589, 592 (E.D. Ark. 1992), *vacated as moot by student's graduation*, 980 F.2d 1208 (8th Cir. 1992).

*Brown v. Oklahoma Secondary Sch. Activities Ass'n*, 125 P.3d 1219, 1226 (Okla. 2005) is very similar to the facts here, in that a high school football player sought injunctive relief from serving a two-game suspension after being ejected from a game. In vacating the lower court's issuance of an injunction, the Oklahoma Supreme Court upheld its previous "refus[al] to interfere in matters involving the Association's decision declaring an athlete . . . ineligible to participate in the football playoffs and requiring the forfeiture of previously played regular season games in which the athlete participated", noting that in the case at issue and a present case "the high school [did not] seek relief nor was there any evidence to indicate fraud, collusion, or action by the Association that could be found to be unreasonable, arbitrary, or capricious." *Id.* The same can be said here, where Chatfield

14

High School is not seeking relief and there is no evidence or allegation of fraud, collusion, or action by the MSHSL.

*Brown* further noted that "each case involved behavior clearly prohibited by the Association rules". *Id.* Plaintiff concedes that he knew that if he was ejected from a contest, he would have to serve a one-game suspension. Plaintiff seeks to side-step this fatal flaw in his case by arguing that he disagrees with the on-the-field-call of the contest official.Like *Brown*,[7] the MSHSL's construction of Bylaws 206.4.B and 407, their application, and the discipline imposed are reasonable. "There is no evidence that the discipline was entered in anything other than good faith and in conjunction with the rule of law by a referee who was positioned to see the play and who reacted immediately to the player's action." *Brown*, at 1227. According to *Brown*, "[w]ithout such evidence, the award of injunctive relief constituted an abuse of discretion." *Id.* Plaintiff's request for a TRO should be denied.

Plaintiff's contention that "there is no logical, or even rational reason for which the MSHSL bans players from appealing these penalties and subsequent suspensions" is incorrect. Plaintiff's MoL, p. 9. The MSHSL's stated mission is "[t]o elevate standards of sportsmanship and to encourage the growth of responsible citizenship among the students, member schools and their personnel." Martens Decl. ¶ 4. To that end, the MSHSL adopted Bylaw 206 which governs, *inter alia*, student conduct and, in particular, the ejection of a student athlete from a contest. The MSHSL has reasonably determined that if a student-athlete is ejected from a game, for any reason, then they are suspended from the following

---

[7] Unlike *Brown*, Plaintiff is directly challenging the decision of the contest officials and the subsequent suspension.

game. The imposition of ineligibility per Bylaw 206.4.B(1) is automatic and mandatory anytime a student-athlete is ejected from a game/contest. Such a penalty for ejection is common amongst high school state activities associations. Martens Decl. ¶ 26.

The MSHSL's construction of Bylaws 206.4.B and 407, their application to this case, and the discipline imposed are reasonable. The MSHSL does not eject student-athletes from games and, critically, the MSHSL did not eject Plaintiff from the game on November 18, 2021. There is no evidence or allegation that the ejection was entered in anything other than good faith and in conjunction with the rule of law by a contest referee who was positioned to see the play and who reacted immediately to Plaintiff's actions.

The on-the-field contest officials determined to eject Plaintiff from the game due to two separate unsportsmanlike conduct penalties. Plaintiff's request that this Court preliminarily enjoin the MSHSL from imposing the mandatory suspension that flows from a player's ejection under Bylaw 206.4.B(1)(c) is a direct challenge to the contest official's decisions. Such a challenge is repeatedly and unambiguously prohibited by Bylaw 407.1 ("protests against decisions of contest officials will not be honored"); Bylaw 407.1.A ("The decisions of contest officials are final."); Bylaw 407.1.B ("the orderly and sportsmanlike conduct of high school activities requires that officials' decisions must be honored and be final"); and Bylaw 407.1.C ("Video recordings will not be used to overrule an official's decision").

MSHSL bylaws are unequivocal that on the field decisions of contest officials will not be reviewed. For example, if Plaintiff had not been penalized or ejected and the affected player or school sought to protest that decision, the MSHSL would have honored the

16

decision of the contest official as final and binding. The same must hold true here. If the government's action does not deprive an individual of a protected life, liberty, or property interest, as is the case here, then no process is due. *See Bd. of Regents v. Roth*, 408 U.S. 564, 570–71 (1972). Because Plaintiff is not entitled to any procedural due process, he has no likelihood of success on the merits and the TRO should be denied.

i.      *Instant Replay Review is Not Applicable.*

Plaintiff's attempts to twist the limited instant replay review into a due process right to challenge a referee's decision to issue a penalty fall far short. As a threshold matter, replay review is limited to narrow circumstances. The types of calls subject to review are factual decisions, such as the "number of players on the field . . . during a live ball", whether a player is "out of bounds", whether or not an "onside kick has traveled 10 yards", and pass interference "where video evidence clearly indicates touching of the pass prior to the foul." Martens Decl. Ex. 2. For a play to be reversed, there "must be indisputable evidence that shows the original call was incorrect." *Id.* Critically for purposes of this lawsuit, an officials' decision to call an unsportsmanlike conduct penalty is not subject to replay review. Martens Decl. ¶ 19.

Even assuming arguendo an officials' decision to call an unsportsmanlike conduct penalty is subject to replay review, the decision of whether to review a play is at the discretion of the Replay Official. Given the allegations here, the Replay Official determined that Plaintiff's penalties were not subject to replay review. Regardless, those decisions are certainly not subject to review now, five days after the contest has been decided. If Chatfield had lost, would Plaintiff seek judicial intervention to enjoin the

17

MSHSL from allowing the opponent to play in the finals because Plaintiff "disagrees with the MSHSL Officials' unsportsmanlike conduct calls issued to him during Chatfield's semifinals football game"? For this very reason, any replay review must occur during the contest. In fact, "[e]very attempt will be made to complete the review in ninety seconds or less" and "without stopping play." Martens Decl., Ex. 2. Last, the express purpose of the replay policy is to "not to make sure that every call is accurate." *Id.* No mistake was made here, as the unsportsmanlike conduct penalties were appropriately determined and the mandatory one-game suspension must be applied. Plaintiff is not entitled to a due process hearing for penalties administered by contest officials during the game of play.

## ii.   *There is no appeal for a student ejection.*

Plaintiff's attempt to twist a very narrow exception specific to basketball coaches similarly fails. Plaintiff cites to a provision of Bylaw 206.4 which allows a basketball coach to appeal the application of an ejection penalty in the narrow situation "when he/she is disqualified for technical fouls and his/her actions did not contribute to the disqualification." This very narrow exception applies to basketball coaches because they are held responsible for the conduct of their bench. For instance, if a player leaves the bench or engages in unsportsmanlike conduct while on the bench that results in a technical foul, it is attributed to the coach. In that situation, the appeal is "heard by the local school administration." There is no appeal, however, when a basketball coach is ejected for their own unsportsmanlike conduct. Bylaw 206.4.C is not applicable to this case.

Accordingly, Plaintiff's citation to this narrow appeal option is misplaced because this option, on its face, does not apply to Plaintiff. First, Plaintiff is not a basketball coach;

18

he is a football student-athlete. Second, Plaintiff was not ejected for technical fouls where his actions did not contribute to the disqualification; rather, his actions directly contributed to two separate unsportsmanlike conduct penalties and the ensuing ejection. Third, Plaintiff is not seeking review by the local school administration but rather went directly to United States District Court. In fact, in correspondence to the MSHSL, the local school administration voiced its agreement that Plaintiff is not eligible to compete in the game on November 26, 2021: "We are not challenging the question of the Student's eligibility for competition. The Student received two unsportsmanlike conduct fouls and we agree that he should not play." Martens Decl. Ex. 3.

### b.      Substantive Due Process

Plaintiff argues that "there is no logical, or even rational reason for" the automatic imposition of a one-game suspension under Bylaw 206.4.B(1)(c) without establishing that substantive due process applies. The judicially created substantive component of the Due Process Clause protects certain "fundamental liberty interests" from deprivation by the government, unless the infringement is narrowly tailored to serve a compelling state interest. *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). "Only in the rare situation when the state action is 'truly egregious and extraordinary' will a substantive due process claim arise." *Winslow v. Smith*, 696 F.3d 716, 736 (8th Cir.2012) (quoting *Strutton v. Meade*, 668 F.3d 549, 557 (8th Cir. 2012)). This is not such a case. As discussed above, *DeLaTorre* rejected Plaintiff's argument that there is a property interest in extracurricular activities.

Plaintiff's argument that he should be varsity eligible because the official got the

call wrong does not render the League's determination arbitrary. The League did not deprive Plaintiff of a constitutionally protected property right or a fundamental constitutional right. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973) ("Education, of course, is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected."); *see also Stevenson*, 800 F.3d at 968. "Merely labeling a governmental action as arbitrary and capricious, in the absence of the deprivation of life, liberty, or property, will not support a substantive due process claim." *Singleton v. Cecil*, 176 F.3d 419, 424 (8th Cir.1999) (en banc).

While a Minnesota student has a legitimate entitlement to a public education, they do not have a fundamental liberty interest in extracurricular varsity athletics. The United States Supreme Court's ruling in *Goss* recognized a protected property right in public education and required due process protections before a student could be subject to "total exclusion from the educational process." 419 U.S. 565, 576 (1975). *Goss* determined that a total exclusion from the educational process was an expulsion or suspension.[8] *DeLaTorre* succinctly described *Goss's* total exclusion analysis in this context:

> [U]nder *Goss*, the property interest which is protected by the Due Process Clause is ***the right to participate in the entire educational process and not the right to participate in each individual component of that process***."

---

[8] In *Goss*, Ohio law required a free education and compulsory school attendance. *Id.* at 573. Although the statute gave certain procedural rights to students facing expulsion, it provided no procedures for students facing suspensions in cases of misconduct. *Id.* The plaintiffs were students who were suspended from attending school without a hearing, and the Court held that the students had protected liberty interests in a public education that could not be taken away by suspension without the minimal procedural safeguards of notice and an opportunity to be heard. *Id.* at 582.

> *Stevenson*, 800 F.3d at 968 (quoting *Mazevski v. Horseheads Cent. Sch. Dist.*, 950 F.Supp. 69, 72 (W.D.N.Y.1997)). At no time did Defendants prevent [plaintiff] from participating in the entire educational process. Notwithstanding the ineligibility determination, he remained free to attend class, to engage in school activities, and to participate in all interscholastic athletics except varsity competition.

*DeLaTorre*, 202 F.Supp.3d at 1059 (emphasis added). Likewise, the League's action here has not excluded Plaintiff from obtaining an education; to the contrary, he is currently enrolled in high school at Chatfield where he is free to attend class, engage in school activities, and to participate in all interscholastic varsity athletics with the exception of the next varsity contest, after which he will be eligible to participate in all interscholastic athletics, including varsity competition (provided he is otherwise eligible). Plaintiff has not been restricted from an entire year or season of participation nor has he been barred entirely from participating in practices or other team activities. His suspension is limited to one-game. Whether that game is the first or final game of the season makes no difference—if a student is ejected from a game, they must serve a one-game suspension. Plaintiff seeks to have the judiciary rewrite MSHSL bylaws to require the MSHSL to allow students, parents, and/or coaches to challenge, in court, the on the field discretionary decisions of contest officials.

Alternatively, even if this Court finds that there is a substantive right to varsity athletic competition, Plaintiff's argument was distinguished by *H.R. v. Minn. State High Sch. League*, where the United States District Court found that plaintiffs "cannot demonstrate a likelihood of success on their claim alleging a substantive due process violation." 2013 WL 147416. "[A] substantive due process violation takes place when

governmental power is exercised arbitrarily and oppressively." *Singleton v. Cecil*, 176 F.3d 419, 431 (8th Cir. 1999) (en banc) (Arnold, J., dissenting) (citation omitted). "Whether government action is arbitrary or capricious within the meaning of the Constitution turns on whether it was so egregious and irrational that the action exceeds standards of inadvertence and mere errors of law." *Condor Corp. v. City of St. Paul*, 912 F.2d 215, 220 (8th Cir. 1990) (citations and internal quotation marks omitted). "The theory of substantive due process is properly reserved for truly egregious and extraordinary cases." *Myers v. Scott Cnty.*, 868 F.2d 1017, 1017 (8th Cir. 1989).

This is not a truly egregious and extraordinary case. First, Plaintiff here does not allege that the MSHSL acted with malice, bad faith, or ill will towards Plaintiff. *See Richmond v. Fowlkes*, 228 F.3d 854, 859 (8th Cir. 2000) ("To succeed on [a substantive due process] claim, [plaintiff] must demonstrate arbitrary and capricious conduct . . . by showing that there was no rational basis for the . . . decision or that dismissal was motivated by bad faith or ill will.").

Second, while Plaintiffs may disagree with the MSHSL's decision, it was not irrational and is, in fact, unambiguously supported by the plain language of MSHSL Bylaws. The MSHSL has effectively denied Plaintiff's argument that he should be granted an exception to Bylaw 407's prohibition against challenging the finality of a decision by a contest official. Plaintiff, unhappy with the referee's decisions on the field, now asks this Court to step into the shoes of the contest official and the MSHSL by issuing the extraordinary remedy of a TRO. Simply because Plaintiff disagrees with the referee's and, in turn, the League's decision, does not, however, render it arbitrary and capricious.

    c.  **The League should be given deference in interpreting its Bylaws.**

Deference should be granted to the League in interpreting its own Bylaws.[9] *See Barnhart* v. *Walton,* 535 U.S. 212, 220 (2002); *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984); *North Haven Bd. of Ed.* v. *Bell,* 456 U.S. 512 (1982). The United States Supreme Court has held that "well-reasoned views of an expert administrator rest on a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Alaska Dep't of Envtl. Conservation v. EPA,* 540 U.S. 461, 487 (2004) (internal citations omitted); *see also Brown*, 125 P.3d at 1226 (Okla. 2005) ("the Association has discretion in construing its rules and determining their applicability. All that is required of the Association is that its rules be reasonable, lawful, in keeping with public policy, and interpreted fairly and reasonably and enforced uniformly and not arbitrarily."). Likewise, the Minnesota Supreme Court has consistently held that courts must give considerable deference to a state agency's construction of its own regulation. *In re Cities of Annandale and Maple Lake*, 731 N.W.2d 502, 512 (Minn. 2007). This is especially true when the administrative practice at stake involves a contemporaneous construction of a rule by the people charged with the responsibility of setting its machinery in motion. *Id.* This factor favors Defendant.

 **B.**  **PUBLIC POLICY FAVORS THE MSHSL.**

Public policy weighs in favor of the League. Granting injunctive relief would inject

---

[9] If the MSHSL and its officers and employees are subject to constitutional claims while acting "under the color of law", then it is logical and reasonable to extend to the MSHSL other protections afforded to government actors.

judicial scrutiny into an area best reserved to contest officials and the League. This is not a case of mistaken identity, as it is undisputed that Plaintiff performed the actions leading to the unsportsmanlike conduct penalties. Instead, Plaintiff simply "disagrees with the unsportsmanlike conduct calls." Verified Compl. ¶ 13. Plaintiff is thus challenging the validity of the on-the-field decisions of the contest official(s). If a TRO is granted, judicial intervention in on-the-field decisions of athletic officials/referees will become the rule rather than the exception.

Public policy must support applying the League's rules and its interpretations of those rules for student extracurricular activities, including the finality of decisions made by contest officials. The MSHSL is responsible for regulating and supervising interscholastic activities and contests between its over 500-member schools that affect approximately 250,000 students throughout the State of Minnesota. Accordingly, it is tasked with enforcing its bylaws consistently and uniformly throughout the state. The Plaintiff's interests in the injunction, in contrast, are purely private and serve no public purpose.

Even if the TRO is denied, Plaintiff will retain varsity eligibility after serving his suspension. The Supreme Court's ruling in *Goss* recognized a protected property right in public education and required due process protections before a student could be subject to "total exclusion from the educational process." 419 U.S. 565, 576 (1975). The League's action here has not excluded Plaintiff from obtaining an education; to the contrary, he is free to attend class, engage in school activities, and to participate in all interscholastic athletics with the exception of the four-game suspension, after which he will be eligible to

participate in all interscholastic athletics, including varsity competition. The public interest favors the MSHSL.

Public policy favors not injecting the judicial system into high school sports. While it is important that officials and referees make accurate and correct decisions, the courtroom is not the appropriate forum for disagreements over those decisions. Granting an injunction here will encourage any student or parent who is aggrieved by what they consider to be a "bad call" to initiate a legal action in an attempt to secure similar relief. Becoming entrenched in a courtroom over a matter of sports officiating is not a proper use of judicial resources. Though officiating accuracy may loom large in the eyes of high school athletes or even their parents, it is not an issue of such magnitude that the involvement of a federal court is necessary.

Even if Defendant were to allow some appeal or review process from penalties, ejections, and suspensions, parties could still invoke the jurisdiction of a court to argue that the process offered was not sufficient. Sports officiating in particular, at all levels from professional to amateur, is not always afforded unbiased or balanced consideration from players or fans. The danger of frivolous claims is high. More so than in other contexts, providing a judicial remedy carries the danger of inviting challenges styled as due process claims, but which actually require a court to review the correctness of unfavorable penalties or ejections. Disputes of this nature are prone to devolving into discussions of the facts surrounding the disputed penalty and interpretations of the rules of a particular sport, even when those matters are not relevant to the underlying due process claim.

Public policy supports denying Plaintiff's motion for two reasons. First, denial

would serve to prevent wasting judicial resources by discouraging future litigation of similar matters. Second, denial keeps the realms of the courts and high school sports comfortably separate and avoids hampering the spirit of high school competition with the specter of litigation. This *Dataphase* factor favors denying injunctive relief.

### C. NATURE OF THE RELATIONSHIP, BALANCE OF HARMS, AND RELATIVE HARDSHIP ALL FAVOR THE MSHSL.

The relationship between the Plaintiff and Defendant is not likely to change whether or not the requested injunctive relief is granted. The relationship between the parties here is involvement in extracurricular activities. The League is a non-profit corporation that governs, as one of its primary purposes, the interscholastic extracurricular activities between its member schools. Plaintiff is a student at a member school. It is significant that the member school is not a party to this action. The parties here are not dependent upon each other to such an extent that further loss will occur if the TRO is not granted; rather, the consequences that Plaintiff faces is a result of his on the field conduct and subsequent ejection. More importantly, whether the TRO is granted or denied will have no impact on Plaintiff's ability to attend and graduate from Chatfield High School. In fact, Plaintiff is not completely barred from activities which the League presides over and is not even completely barred from participating in the varsity football program. Plaintiff was not been suspended from the team; he has only been restricted from playing in one game.

Absent a temporary restraining order, Plaintiff will ***temporarily*** lose the opportunity to play in one varsity athletic competition. Even if the restraining order is denied, Plaintiff will be eligible to compete in varsity competitions after serving his one-game suspension

and, more importantly, is able to attend class, engage in school activities, and to participate in all interscholastic athletics except four games of varsity competition. Plaintiffs' alleged harm is therefore neither permanent nor irreparable. *See, e.g.*, *Revesz v. PIAA*, 798 A.2d 830, 837 (Pa. Commw. Ct. 2002) ("the loss of an opportunity to play interscholastic athletics for one year does not constitute irreparable harm.").

It would, however, be a great burden on the League to reinstate the eligibility of Plaintiff before a trial on the merits. To do so would bypass the League's control over the interpretation and application of its own bylaws and open the door to unknown detriments, which would greatly reduce the League's ability to enforce its rules. Effectively, any time a student-athlete is ejected, the League (and ultimately the Courts) would need to conduct evidentiary hearings to determine whether the official "got the call right." Even in non-ejection settings, the MSHSL and the Courts would be required to engage in evidentiary hearings to determine whether a discretionary decision of a contest official was correct. Such a burden would be extremely onerous given the size of the League's membership and the volume of competitions and decisions by contest officials each year. It is for this reason that courts have been reluctant to intrude upon local decisions regarding extracurricular matters—because judicial intervention in extracurricular eligibility would become the rule rather than the exception. *See Jordan v. O'Fallon Twp. High Sch. Dist. No. 203*, 706 N.E.2d 137, 142 (Ill. App. Ct. 1999) (declining to elevate participation in interscholastic athletics into a protected property right because it would require procedural due process in every situation where a student's participation in extracurricular activities was at stake). As astutely described by the 5th Circuit:

> **[W]e are not super referees over high school athletic programs.**
> Questions about eligibility for competition may loom large in the eyes of
> youths, and even their parents. We do not disparage their interest in
> concluding, as here, that these issues are not of constitutional magnitude.
> Behind this observation rest important values of federalism and the reality
> that the mighty force of the constitutional commands ought not to be so
> trivialized.

*Hardy v. University Interscholastic League*, 759 F.2d 1233, 1235 (5th Cir. 1985) (emphasis

added). The implementation of an appeal process for penalties called by contest officials is

not reasonable given the sheer number of games, number of calls made within each game,

the inconsistency of video coverage, and the administrative burden it would place on the

MSHSL. Martens Decl. ¶ 20.

To further add to the administrative burden and harm to the MSHSL, if the TRO is

granted and Plaintiff is subsequently determined ineligible after a trial on the merits,

forfeiture of all contests in which Plaintiff participated should be "automatic and

mandatory" under Bylaw 304. The potential harm is underscored by the analysis of *W.D.*,

which dismissed this argument as "of little concern because any attempt to challenge [the

student's participation] or sanction [the school] for allowing [the student] to participate

when this Court had explicitly authorized [the student's] participation would be baseless."

2012 U.S. Dist. LEXIS 169516, *21. *W.D.*'s reasoning highlights the harm to the MSHSL

if a TRO issues and the student is ultimately determined ineligible after a trial on the merits

(e.g. the precise situation in *Giblin*). In effect, the League would be powerless to enforce

its bylaws—namely, Bylaw 304 which expressly states that "if an ineligible student is used

in any interscholastic contest, whether deliberately or inadvertently, forfeiture of the game

and honors for team sports and points and honors for individual sports shall be automatic

and mandatory."

Thus, the League could not act to enforce this bylaw even though it ultimately prevailed at trial. In short, the school and student would be temporarily immune from application of the League's bylaws. Such harm is irreparable because it is not quantifiable nor compensable with money damages. *See, e.g., Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 318-20 (8th Cir. 2009). This is precisely the reason why a TRO is an extraordinary equitable remedy meant to "preserve the status quo until adjudication of the case on its merits." *Metropolitan Sports Facilities Com'n v. Minnesota Twins Partnership*, 638 N.W.2d 214, 220 (Minn. App. 2002).

A temporary restraining would seriously disrupt and confuse the League's ability to administer interscholastic events and recruit and retain contest officials. This could negatively impact hundreds, if not thousands, of student-athletes in the State of Minnesota and would add to the administrative burden and expense of the League in governing interscholastic contests. The harm to the League in this case outweighs the temporary harm alleged by Plaintiff and, therefore, Plaintiff's motion should be denied.

## CONCLUSION

Plaintiff has not met his burden to prove the need for a temporary injunction. A weighing of the *Dataphase* factors demonstrates that the League has shown that the factors and equities heavily favor Defendant, and thus no injunction should issue. Plaintiff's motion for a TRO is improper because it seeks to reverse the status quo, bypass a determination of necessary issues on the merits, and effectively seeks the ultimate relief sought. In this case, the status quo is maintained by *not* issuing a temporary injunction. The

party's relationship and status is maintained by *not* issuing the order. Plaintiff seeks an extraordinary remedy without sufficient grounds, and Plaintiff's motion for a temporary restraining order should be denied

Respectfully submitted,

**KELLY & LEMMONS, P.A.**

Dated: November 24, 2021            */s/ Joseph A. Kelly*
                                    Kevin M. Beck (#389072)
                                    kbeck@kellyandlemmons.com
                                    Joseph A. Kelly (#389356)
                                    jkelly@kellyandlemmons.com
                                    2350 Wycliff Street, Suite 200
                                    Saint Paul, MN 55114
                                    (651) 224-3781

                                    *Attorneys for the MSHSL*